UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DAVID J. WILBURN, JR., et al.   PLAINTIFFS

v.   NO. 3:13-CV-384-CRS

UNITED STATES OF AMERICA   DEFENDANT

**MEMORANDUM OPINION**

This matter is before the court on the motion of the defendant, the United States of America, to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). (DN 23). Plaintiffs[1] filed a response to the motion (DN 28), to which the United States replied (DN 29). For the reasons set forth herein, we will grant the United States' motion to dismiss (DN 23).[2]

**I. BACKGROUND**

This matter arises from a tragic incident that occurred on September 11, 2007, when United States Army Sgt. Brent Burke ("Burke") fatally shot his estranged wife, Tracy Burke ("Tracy"), and her former mother-in-law, Karen Comer ("Comer"), in Comer's Rineyville, Kentucky home. Present in the home at the time of the shooting were Burke and Tracy's two minor children, Eion M. Burke and Raegan A. Burke, as well as Matthew T. Pete, Tracy's minor son from a prior marriage. At the time of the incident, Burke was stationed at Fort Campbell, where he served as a Military Police Officer for the United States Army.

---

[1] Plaintiffs in this action include David J. Wilburn, Jr., on behalf of Eion M. Burke and Raegan A. Burke; David J. Wilburn, Jr., as the representative of the Estate of Tracy Burke; Michael D. Pete, Jr., on behalf of Matthew T. Pete; and Kurt Comer, as the representative of the Estate of Karen Comer.

[2] Plaintiffs have also filed a motion for a hearing on the motion to dismiss. (DN 30). However, "dispositive motions are routinely decided on papers filed by the parties, without oral arguments." *Scott v. Metro. Health Corp.*, 234 F. App'x. 341, 359 (6th Cir. 2007) (unpublished). The court does not need oral argument to decide the motion as both parties have adequately briefed the issues before the court. Therefore, we will deny Plaintiffs' motion. (DN 30).

On May 8, 2012, a seven-person military tribunal found Burke guilty of the murders of Tracy and Comer. Plaintiffs have now filed suit in this court as representatives of Tracy's minor children and administrators of the estates of Tracy and Comer. They seek to recover damages from the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 ("FTCA").

In the Amended Complaint, Plaintiffs provide the following description of the events that led up to the September 11, 2007 shooting of Tracy and Comer. Plaintiffs contend—and the United States does not appear to dispute—that Burke had a history of engaging in violent outbursts in both his personal and professional lives. In 2005, while deployed to Egypt, Burke received mental health treatment and was prescribed medication after he attempted to run down an Egyptian guard and threatened to kill his platoon leader. (Am. Compl., DN 22, ¶¶ 10, 15–18). At this time, Burke and Tracy were also having marital problems, and Burke allegedly expressed an intent to kill either himself or Tracy if she "left him." (*Id.* ¶¶ 11-13).

On May 26, 2007, after Burke returned from tour of duty in Afghanistan, local law enforcement was called in response to an off-base domestic violence episode between Burke and Tracy. (*Id.* ¶ 22). Plaintiffs claim that Burke attempted to physically prevent Tracy from leaving him and moving in with Comer at her Rineyville, Kentucky home. (*Id.*). The incident was reported to Burke's chain of command at Fort Campbell and, as a result of the Army's investigation, Burke was ordered to take a 72-hour "cooling off" period in the barracks and attend counseling and social services. (*Id.* ¶¶ 23, 30). Plaintiffs allege that even though the investigating officer indicated in his report that Burke's weapons were confiscated, no weapons were actually confiscated, in violation of certain Army regulations. (*Id.* ¶¶ 32–34).

Following the May 26, 2007 incident, Burke and Tracy separated and Tracy filed for divorce. (*Id.* ¶ 35). Burke moved into the barracks at Fort Campbell. (*Id.*). Plaintiffs allege that in June 2007, Burke told a fellow soldier that he was "going to shoot the bitch [Tracy]" and "take her [Tracy] into the woods and shoot her." (*Id.* ¶ 40). The statements were reported to Burke's supervisor, who dismissed them as merely "blowing off steam." (*Id.* ¶ 41).

Local law enforcement was again called in on August 11, 2007 in response to a second domestic violence incident between Burke and Tracy. (*Id.* ¶ 43). The Army was notified of this incident, but it did not conduct an independent investigation. (*Id.* ¶ 44). Following this incident, Burke allegedly told a fellow serviceman that "he would be better off if his wife [Tracy] was dead." (*Id.* ¶ 46). Upon hearing of this statement, Staff Sgt. Jonathan W. Dean allegedly confiscated the 9mm pistol that was privately owned by Burke. (*Id.* ¶ 47). On August 31, 2007 Burke requested that his pistol be returned to him for recreational use, and Stg. Dean thereafter arranged for the weapon to be returned to Burke. (*Id.* ¶ 48). Plaintiffs allege that on September 11, 2007, Burke used that weapon to shoot Tracy and Comer. (*Id.* ¶ 50).

## II. STANDARD

The United States seeks to dismiss all of the claims against it on the grounds that the court lacks subject matter jurisdiction over the case and that Plaintiffs failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), (6).

"Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may either attack the complaint on its face or go beyond the complaint

and challenge the factual existence of subject matter jurisdiction. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the motion attacks the claim of jurisdiction on its face, the court must consider all allegations in the complaint as true. *Id.* Alternatively, if the attack is the factual basis for jurisdiction, the evidence must be weighed and the plaintiff bears the burden of proving that jurisdiction exists. *Id.*

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, it is not enough that the complaint contains "facts that are merely consistent with a defendant's liability;" rather, a plaintiff must allege "facts—not legal conclusions or bald assertions—supporting a 'plausible' claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A complaint that offers legal conclusions or a recitation of the elements of a cause of action will not meet this pleading standard. *See id.* "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). The court must take all of the factual allegations in the complaint as true, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown the pleader is entitled to relief. *Id.* at 677–78.

### III. DISCUSSION

The United States makes two arguments in support of its motion to dismiss: (1) Plaintiffs' claims are barred by the intentional tort exception of the FTCA; and (2) Plaintiffs' claims are barred by the discretionary function exception of the FTCA. We will address each argument in turn, after briefly discussing the types of actions permitted under the FTCA.

The United States is immune from suit unless it has expressly waived its sovereign immunity and consents to be sued. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). The FTCA provides a waiver of the federal government's sovereign immunity and grants federal courts exclusive jurisdiction over tort claims where "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The United States' liability under the FTCA is "determined in accordance with the law of the state where the event giving rise to liability occurred." *Young v. United States*, 71 F.3d 1238, 1242 (6th Cir. 1995) (citations omitted). Because the incident occurred in Kentucky, the substantive law of Kentucky will control this dispute. *Id.*

**A. Intentional Tort Exception**

The FTCA's waiver of immunity is limited, in that it is subject to certain exceptions and exclusions. "If a case falls within the statutory exceptions of 28 U.S.C. § 2680, the court lacks subject matter jurisdiction." *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir. 1984) (citations omitted). Section 28 U.S.C. § 2680(h) contains an intentional tort exception which provides that any claim "arising out of," *inter alia*, an assault or battery is excluded from the FTCA's sovereign immunity waiver provision.

The Supreme Court considered the scope of the intentional tort exception in *United States v. Shearer*, 473 U.S. 52 (1985). Justice Burger, writing for a divided Court,[3] stated:

> Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee.

---

[3] Justice Powell did not participate in the decision of the Court. Justices Brennan, Blackmun, Stevens, and Marshall declined to join in this portion of the opinion, finding instead that the *Feres* doctrine provided an adequate ground for reversal.

*Id.* at 55 (emphasis in original). Although the majority of the court did not join in this reasoning, the Sixth Circuit expressly adopted it in *Satterfield v. United States*, 788 F.2d 395, 399 (6th Cir. 1986). In *Satterfield*, the Sixth Circuit, applying *Shearer*, dismissed the plaintiff's intentional tort claim sounding in negligence because the claim fell within the intentional tort exception of § 2680(h). *Satterfield*, 788 F.2d at 400.

The Sixth Circuit's holding in *Satterfield* would seem to require dismissal of the complaint in the instant action, as Plaintiffs' claims are based on the United States' alleged negligence in failing to warn and protect Tracy from the harm posed by Burke. Specifically, Plaintiffs claim that the Army breached its duties to confiscate and store Burke's privately owned weapons; to prevent Burke from contacting Plaintiffs; to provide Burke with adequate treatment of his psychological disorders; to supervise Burke; and to warn and protect Plaintiffs from a known threat of violence. (Am. Compl., DN 22, ¶ 51).

However, the Supreme Court in *Sheridan v. United States* recognized that a claim premised on the government's negligence in permitting a government employee to commit an assault or battery may not be barred under the intentional tort exception when the alleged negligence is independent from and unrelated to the tortfeasor's status as a government employee. 487 U.S. 392, 401 (1988). That case involved claims brought by private citizens who suffered personal injuries and property damages when an off-duty serviceman fired at their car on a public street near a naval hospital. *Id.* at 393–94. Prior to the shooting, three naval corpsmen had found the man "lying face down in a drunken stupor" on the hospital floor and brandishing a weapon, but they neither attempted to subdue him nor reported his condition to authorities. *Id.* at 395.

The plaintiffs in *Sheridan* alleged that their claims were not barred by the intentional tort exception because their injuries resulted from the United States' negligence in permitting the serviceman to leave the hospital with a loaded weapon. *Id.* at 394. The plaintiffs argued that the government voluntarily assumed a duty to protect them by enacting regulations that required naval employees to report individuals who were carrying weapons, and that the corpsmen breached a "Good Samaritan" duty when they abandoned the intoxicated serviceman. *Id.* at 401. Although the majority of the Court did not rule on whether the intentional tort exception would preclude a claim based on negligent hiring, training, or supervision of government employees, the majority recognized that "the negligence of other Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of [the serviceman's] employment status." *Id.* at 401–03. The Court instructed the Fourth Circuit to consider on remand whether the plaintiffs asserted a cause of action under Maryland law arising from the acts of the United States, independent of the serviceman's own tortious actions. *Id.*

On remand, the plaintiffs argued to the Fourth Circuit that the United States assumed a duty of care when it issued orders that prohibited firearms from being carried on the base and required government employees to report disciplinary infractions. *Sheridan v. United States*, 969 F.2d 72, 74 (4th Cir. 1992) ("*Sheridan II*"). The Fourth Circuit rejected this argument, finding instead that under Maryland law, the United States did not have a duty to protect the plaintiffs from the serviceman's intentional criminal acts. *Id.* at 74–75 ("Plaintiffs suffered no greater risk of harm on the streets surrounding [the hospital] from a serviceman such as [the assailant] because of the gratuitous promulgation of the regulations and their breach than if the United States had never promulgated such regulations in the first instance.").

The Fourth Circuit held that "plaintiffs' claim is, in reality, nothing more than a negligent supervision claim which is barred by the intentional tort exception, 28 U.S.C. § 2680, a result not foreclosed by the Supreme Court's decision [in *Sheridan*]." *Id.* at 75. And, although the Supreme Court had reserved the issue of whether the intentional tort exception would bar a negligent supervision claim, the Fourth Circuit noted that Justices Kennedy, concurring in the judgment, and O'Connor, dissenting, would both find such a claim to be excluded. *Id.* (citing *Sheridan*, 487 U.S. at 403 n.8, 407–08, 411). The Fourth Circuit concluded that because the regulations upon which the plaintiffs relied "only set forth internal rules for the supervision of naval employees" rather than "set[ting] forth general requirements applicable to all who come into contact with the base," a claim premised on the failure to follow the regulations was merely an allegation of negligent supervision. *Id.*

In the instant action, Plaintiffs allege that the United States assumed a duty of care by adopting internal regulations that required officers at Fort Campbell to protect victims of domestic violence, confiscate and store privately-owned weapons of soldiers housed at the base, and prohibit soldiers with certain psychological disorders from holding specified positions in the Army. Plaintiffs further argue that the government owed these duties independently of its employment relationship with Burke.

Plaintiffs first argue that Policy 7 gave rise to a special relationship that imposed on the United States a duty to warn and protect Tracy. The Army implemented Policy 7 with the purpose of providing Unit Commanders with a uniform method of responding to incidents of domestic violence. Policy 7 states that "[d]omestic violence poses a clear threat to the safety and welfare of the members of our military community. The greater the crisis and the need to protect, the greater the need to move quickly and focus on the safety of the individual(s) needing

protection." (DN 23-2, p. 2). Unit Commanders are instructed to "take the actions listed in [the Domestic Violence Checklist] when they become aware of an allegation of domestic violence involving a member of his or her command." (*Id.*). The Domestic Violence Checklist, in turn, instructs commanders to take certain steps "[u]pon notification or discovery of any incident of credible allegation of domestic violence . . . ." (*Id.* at 4). These steps include referring the soldier to mental health for evaluation if the incident involved a weapon or threat to kill, imposing a 72-hour "cooling off" period during which the soldier must move into the barracks, and ordering the soldier to immediately turn in all privately-owned firearms to the unit arms room. (*Id.*).

In contrast to the regulations cited by the plaintiffs in *Sheridan II*, Policy 7 recognizes the Army's special interest in the welfare of third parties involved in domestic violence incidents with soldiers, whom it refers to as the members of "our military community." Yet any alleged duties imposed on the government by virtue of Policy 7 are indistinguishable from the government's general duty to supervise its employees. Although the Checklist instructs investigating commanders to contact the Family Advocacy Victim Advocate Program to "ensure the victim is aware of the programs and policies that provide support and protection," the Checklist primarily governs the actions the Army must take with respect to the soldier involved in the incident. (*Id.*). The investigating commander is instructed to, *inter alia*, refer the soldier to mental health for an evaluation if the incident involved a weapon or a threat to kill; impose a 72-hour "cooling off" period and require the soldier to move into the barracks; and order the soldier to turn in privately-owned firearms to the unit arms room. (*Id.*).

In sum, Policy 7 does not impose a duty on the government that is independent of its general duties to supervise its employees. Stated another way, the Army need not comply with

Policy 7's provisions were it not for its status as Burke's employer. Accordingly, Policy 7 does not impose a duty on the government independent of the duties it has to monitor and supervise its employees, and thus is an insufficient basis for imposing liability on the government.

Moreover, Kentucky law does not impose a general duty to protect third parties from harm, nor does it require an actor to control a third party in the absence of a special relationship between the actor and the third party. *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 850 (Ky. 2005). Kentucky recognizes the following special relationships as giving rise to the duty to control a third party: parent and child; employer and employee, if the harm is committed during the scope of employment; owner of land and an invitee; one who takes charge of a person with dangerous propensities, such as a jailor with a prisoner; and mental health professionals and patients. *Id.* (citations omitted). Plaintiffs do not allege that Tracy and the United States shared any of the aforementioned relationships.[4] And, although Burke was employed by the government, the harm under these facts occurred outside of the scope of the employment relationship. Absent such a special relationship imposing a duty to protect or control, the United States has no common law duty to protect Tracy or control Burke's actions taken outside the scope of his employment.

Similarly, the Army regulations cited by Plaintiffs that govern the confiscation and storage of weapons, as well as those regarding mental health, do not establish a duty on the United States independent of the duties it owes by virtue of its employment relationship with Burke. As in *Sheridan II*, these regulations set forth internal rules regarding the supervision of Army employees, insofar as each regulation applies to and governs the conduct of Army

---

[4] Moreover, Plaintiffs have not cited to a duty under Kentucky law that would require an actor to warn a potential victim of a third person's violent behavior if the victim is already aware of the danger. As the victim of Burke's violence, Tracy was aware of his potential for violence. Plaintiffs have alleged that after the May 26, 2007 domestic violence incident, Tracy told Burke's chain of command that she was afraid of him and was worried about his access to weapons. She also requested a protective order. Therefore, Plaintiffs have not identified an independent, common law duty that the United States owed to Tracy to warn of a danger of which she was already well aware.

personnel. "To premise a claim on failure to follow these regulations, with nothing more, is simply to assert that [Army] employees were not properly supervised." *Sheridan II*, 969 F.2d at 75.

We also reject Plaintiffs' arguments that the United States had either a common law duty or statutory duty pursuant to KRS § 202A.400[5] to warn and protect Tracy from Burke's threats of violence. As stated above, Kentucky law does not impose a general duty to control a third party, absent a pre-existing special relationship between the parties. *Carneyhan*, 169 S.W.3d at 850. Plaintiffs have not established that such a special relationship exists in the instant action.

Further, KRS § 202A.400 does not establish a duty on the part of the United States to warn Tracy of the threats made by Burke. Section 202A.400 provides:

> No monetary liability and no cause of action shall arise against any mental health professional for failing to predict, warn of or take precautions to provide protection from a patient's violent behavior, unless the patient has communicated to the mental health professional an actual threat of physical violence against a clearly identified or reasonably identifiable victim, or unless the patient has communicated to the mental health professional an actual threat of some specific violent act.

KRS § 202A.400(1). The statute defines a "mental health professional" to include, among others, psychiatrists or physicians engaged in mental health services, registered nurses, and licensed clinical social workers. *Id.* § 202A.400(4). The Kentucky Supreme Court has held that an actual threat can be "communicated by a patient to the mental health professional indirectly *through agents or ostensible agents* of that professional who have a duty to relay the patient's information." *Devasier v. James*, 278 S.W.3d 625, 631 (Ky. 2009) (emphasis added).

Kentucky courts have yet to define the category of persons who would be considered "agents or ostensible agents" of a mental health professional. Plaintiffs argue that Kentucky

---

[5] In the Amended Complaint, Plaintiffs allege that KRS § 202A.440 provides the source of a duty to warn. As no such statutory provision exists, the court will assume that Plaintiffs intended to refer to KRS § 202A.400.

-11-

courts would presumably include within this definition "medical officers" employed by the Army. Even so, Plaintiffs have not alleged that Burke communicated any threats to medical officers employed by the Army. Rather, the Amended Complaint alleges that Burke communicated the threats to his fellow officers and those in his chain of command. It is unlikely that the Kentucky Supreme Court intended for such persons to be considered "agents" of mental health professionals. Plaintiffs have not directed the court to any other special relationship recognized under Kentucky law that would impose a duty on the United States with regard to its medical treatment of Burke.[6] Therefore, we find that KRS § 202A.400 did not impose a duty on the United States to warn Tracy of Burke's threats.

Plaintiffs have not alleged that the United States had a duty to warn or protect Tracy that is independent from its employment relationship with Burke. Therefore, Plaintiffs' claims are barred by the intentional tort exception. *See Satterfield*, 788 F.2d at 399–400; *Estate of Smith v. United States*, 509 F. App'x 436 (6th Cir. 2012) (unpublished).

### B. Discretionary Function Exception

Having determined that Plaintiffs' claims are barred by the intentional tort exception of § 2680(h), we need not reach the issue of whether the discretionary function exclusion would require dismissal of this action.

---

[6] Plaintiffs argue that without the benefit of discovery they cannot determine whether Burke communicated a threat to the Army's medical officers. (DN 28, p. 20). However, we are unconvinced that Plaintiffs would benefit by engaging in discovery on this issue, as Plaintiffs allege in the Amended Complaint that, following the domestic violence incident on May 26, 2007, there was "no indication that the Army took any steps to assess, counsel or treat Burke's long history of psychological disorders[.]" (Am. Compl., DN 22, ¶ 31).

## IV. CONCLUSION

For the reasons set forth herein, we will grant the United States' motion to dismiss (DN 23). A separate order and judgment will be entered this date in accordance with this Memorandum Opinion.

May 16, 2014

**Charles R. Simpson III, Senior Judge**
**United States District Court**